COWLES ELECTRIC SMELTING & ALUMINUM CO. et al. v. LOWREY.

(Circuit Court of Appeals, Sixth Circuit. February 15, 1897.)

1. CONSTRUCTION OF CONTRACTS - GRAMMATICAL RULES.
   A contract is to be construed in strict accordance with grammatical rules, unless there are circumstances requiring a departure therefrom. But the grammatical rule raises only a prima facie presumption, and does not preclude the settling of the meaning by detracting somewhat from the exactness of the language, to give effect to more cogent reasons of a different kind. Thus, plural language may be held to include the singular also.

2. PATENTS—CONSTRUCTION OF TERMS—"ELECTRIC SMELTING."
   The word "smelting," as used in the phrase "electric smelting," to designate a process of reducing ores by the use of electric current, is not necessarily confined to its more technical meaning of melting ores in the presence of some reagent, as carbon, which operates to separate the metallic element by combining with the nonmetallic element, but may include a reduction effected by the electric current in the absence of a reagent, the current effecting the same purpose as the reagent.

3. CONSTRUCTION OF CONTRACTS—UNDERSTANDING OF THE PARTIES.
   A party must be deemed to have assented to a contract in the sense which he knew the other party intended it to signify, if the language employed is capable of that meaning.

**4. SAME—ASSIGNMENTS.**

Certain inventors who had pending certain applications, etc., for patents relating to "electric smelting processes and furnaces," procured from other alleged inventors of similar processes an assignment of all their discoveries and inventions, patents, pending applications, and caveats on file, "relating to electric smelting processes and furnaces, which do or may interfere with" any pending applications of the assignees. *Held*, that the word "interfere" was not used in the strict technical sense in which it is used in the patent office, and that the contract showed a purpose to remove all obstructions, so that the applications filed by the assignees might proceed without any contest by the assignors.

**5. SAME.**

An assignment by two inventors of all their discoveries, applications, and patents relating to "electric smelting processes and furnaces," construed, and *held* to pass title to a pending individual application of one of the assignors for a process of reducing ores by "electrolysis," where the essential idea set forth in the applications of both assignor and assignees was the reduction of ores and metallic compounds by depositing the material to be treated between the electrodes of a dynamo-electrical machine, and passing therethrough the electric current, electrolysis being merely an incident of that operation. 68 Fed. 354, reversed.

**6. CONSTRUCTION OF CONTRACTS—SUBSEQUENT CONDUCT OF PARTIES.**

The subsequent conduct of the parties may sometimes be resorted to, to aid in the construction of their contract, but can only be considered when the contract, read in the light of surrounding facts, leaves its meaning in doubt; and, if the subsequent action of the parties gives nearly equal ground for opposite conclusions, no aid is to be derived therefrom.

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

The bill in this case was filed in the court below by Grosvenor P. Lowrey, of the city of New York, against the Cowles Electric Smelting & Aluminum Company, an Ohio corporation doing business at Cleveland, and Alanson T. Osborn, the treasurer of the company, for the purpose of removing a cloud upon the title of the complainant in two patents assigned to him by one Charles S. Bradley, the patentee therein, and to quiet the title of the complainant in said patents. The bill, after setting up the obtaining of the patents by Bradley and the transfer thereof to the complainant, alleged that the defendant, the Cowles Electric Smelting & Aluminum Company, had set up and asserted title to the same patents, under a certain contract made on the 18th day of May, 1885, between the said Cowles Electric Smelting & Aluminum Company of the one part and the said Charles S. Bradley and one Francis B. Crocker of the other part, whereby, as the defendants claimed, all the right, title, and interest of the said Bradley in the invention covered by the patents so assigned to the complainant had been assigned by the said Bradley to the said company; and that the company had executed an instrument of assignment of the said patents to Alanson T. Osborn, its treasurer, and caused the same to be placed upon the record of assignments in the patent office. It is claimed in the bill that this instrument of assignment to Osborn was false and fraudulent, and had no foundation in the contract upon which the company claimed title, and that putting the same on record and the assertion of claim to the Bradley patents, under a claim founded upon the contract above mentioned, operated to create a cloud upon the complainant's title. The contract made specific mention of an application of Bradley and Crocker, No. 158,805, then on file in the patent office. The bill sets out this contract in an exhibit, which will be presently copied, and alleges: "That while the language in said agreement between Crocker and Bradley and said Cowles Electric Smelting & Aluminum Company is broad enough in its general terms to cover other inventions of said Crocker and Bradley than that embraced in said application No. 158,805, it was not intended to and did not in fact embrace any other inventions;" and that the application of Bradley, upon which the patents were issued to him as above mentioned, "was not by any act, understanding, or contract of the parties included in said agreement of May 18, 1885." The defendants appeared and pleaded to

the bill, the substance of the plea being a statement of the facts and circumstances under which the contract of May 18, 1885, was executed, and a claim of title to the Bradley invention; and an answer, setting up substantially the same facts, was filed in support of the bill. The case having been brought on for hearing upon the defendants' plea, the same was overruled by the court, and the defendants, under leave of the court, then filed a further answer to the bill, and they also filed a cross bill, praying that the assignment to the said Grosvenor P. Lowrey might be decreed to be null and void, and that he might be perpetually enjoined from claiming any right, title, or interest in the said Bradley patents or either of them. Thereupon, a replication to the answer having been filed, and the pleadings upon the cross bill having been perfected, proofs were taken, and the cause again came on for final hearing. The case having been heard and considered, the court below decreed in favor of the complainant, holding, in its opinion, that Bradley's invention did not pass to the Cowles Electric Smelting & Aluminum Company by the contract of May 18, 1885. The opinion of the court upon the overruling of the plea is found in 56 Fed. 488, and the opinion on the final hearing in 68 Fed. 354. On the 8th of April, 1885, one Colgate Hoyt, acting in behalf of the Cowles Electric Smelting & Aluminum Company, procured from C. S. Bradley, who resided at Yonkers, N. Y., an option for the purchase of an interest in Bradley's inventions in the art, and took from him a writing witnessing it, as follows:

"New York, April 8, 1885.

"By and between Charles S. Bradley and Colgate Hoyt, both of Yonkers, in the state of New York, it is agreed as follows: Said Bradley shall, upon demand of said Hoyt, made at any time within ninety days from the date hereof, assign to said Hoyt, or his order, for the consideration of ten thousand dollars cash, an undivided one-quarter interest in all inventions which he has hitherto made in electric furnaces, and in the reduction of ores by electricity, and of all patents to be granted therefor, whether applications for such patents have already been filed or shall hereafter be filed, in the patent office of the United States; and, in consideration of the option being granted, said Hoyt, or the party to whom he may have assigned the same, shall pay to said Bradley, at the date hereof, the sum of five hundred dollars.

"Charles S. Bradley."

"New York, April 8, 1885.

"Received of Colgate Hoyt five hundred dollars.

"Charles S. Bradley."

This appears to have been in duplicate, for upon the making of the contract next to be mentioned such a writing was delivered up by each of the parties to the other.

Not long thereafter a correspondence was opened by the company with Bradley and Crocker for the purpose of purchasing their inventions, the immediately moving causes of which were an interference which had been declared in the patent office between one of the Cowles applications and that of Bradley and Crocker, and an interference of a caveat of Bradley and Crocker with another of the Cowles applications. The result of this correspondence was that Bradley and Crocker came to Cleveland a day or two before the 18th of May, and, after further negotiations, reached an agreement. The contract upon which the controversy turns was made on the day of its date, and is here set forth, as follows:

"This agreement, entered into this 18th day of May, 1885, between F. B. Crocker, of New York City, N. Y., and C. S. Bradley, of Yonkers, N. Y., constituting the first party, and the Cowles Electric Smelting and Aluminum Company, of Cleveland, Ohio, a corporation organized under the laws of the state of Ohio, constituting the second party, witnesseth that whereas, the first party have made certain discoveries and inventions relating to electric smelting processes and furnaces, and have made some applications for patents therefor, in the United States patent office; and whereas, the said second party is desirous of becoming the owner of such discoveries and inventions,—it is therefore agreed between the parties as follows: (1) For the consideration hereinafter mentioned, the receipt of which to our full satisfaction is hereby acknowl-

edged, the said first party does hereby sell, assign, and set over to the said second party all their interest in any and all discoveries and inventions relating to electric smelting processes and furnaces, and all patents they have obtained therefor, and all applications now pending and caveats on file in the United States patent office relating to electric smelting processes and furnaces, which do or may interfere with any application for patents made by Eugene H. Cowles and Alfred H. Cowles, of Cleveland, Ohio, now pending in the United States patent office. It is understood and agreed between the parties that this clause also includes the application of said first party now pending in the United States patent office and designated 'Serial Number 158,805,' and filed March 14, 1885. (2) Said first party also sells, assigns, and sets over to said second party their entire interest in all inventions, patents, and applications for patents in all foreign countries for the discoveries and inventions mentioned in the preceding clause of this agreement. (3) Said first party hereby authorizes and requests the commissioner of patents to issue to said second party patents for said discoveries and inventions mentioned in the first clause of this agreement. (4) Said first party for said consideration further agrees to sign and execute all papers necessary to perfecting applications for said inventions and obtaining patents therefor. (5) In consideration of the preceding, said second party hereby pays in hand to said first party the sum of five thousand dollars. In testimony whereof said parties have hereunto set their hands the day and year first above written.                           Francis B. Crocker.
                                                   "Charles S. Bradley."

The material facts and circumstances which are referred to by the respective parties for the purpose of construing this contract, and ascertaining the intent and purposes of the parties therein, were these: The Cowles Electric Smelting & Aluminum Company, having just been organized at Cleveland, was about to engage in business, principally that of the manufacture of aluminum. In aid of this purpose it had become the owner of several inventions made by Eugene H. and Alfred H. Cowles, relating to the reduction of metallic ores and compounds, and especially to the production of aluminum from its ores and compounds by smelting them by means of the electric current. The first of these applications was one filed December 24, 1884, by E. H. & A. H. Cowles, and it was stated therein that their invention related to improvements in electrical furnaces and the method of operating the same; and it was further stated that the invention related to that class of electric furnaces in which heat was generated by means of the incandescence of a resistance body. The apparatus contemplated consisted of the electrodes of a dynamo-electrical machine placed within and on the opposite sides of the chamber or containing vessel and of the material deposited therein, and the process consisted of placing between the electrodes a mass of ore or other material to be operated upon, intermixed with carbon, both in a granulated or pulverized condition, and then passing through the material the electric current. In this mixture the carbon was intended to serve the purpose of a resistance medium in which a high degree of heat would be produced by compelling the current through it. Thereby the commingled ore in contact with it would be fused and separated from its chemical compounds. In reference to the material to be treated, it was said that it might be "mixed with the granular resistance medium, or imbedded in it, or otherwise brought in close contact therewith; or it may constitute, in itself, the resistance medium, according to the character of the material and the object sought to be accomplished." And in a subsequent part of the specifications this was further explained by saying: "Some ores or chemical mixtures may be of such a character, as to conductivity or resistance, as to become incandescent when treated in the above-described manner, in which case the addition of carbon is not necessary. The current of electricity passing through the mass of broken or pulverized ore, or mixture, will, in that case, generate the heat necessary to smelt or reduce it." The specifications give the construction of the apparatus and the mode of combination in detail. It is only necessary here to state them generally, as above. The claims appended thereto were 10 in number; some of them were for the apparatus and others for the process, of which may be especially noted claim 6, which was as follows: "(6) The method of smelting ore herein described, which consists in pulverizing the ore and introducing the pulverized ore in a dry state within

the circuit of an electric current by means of which the ore is reduced, substantially as and for the purpose set forth." This claim 6 was subsequently amended by inserting after the word "current," in the third line: "The said circuit being established through the body of dry pulverized ore of which it forms a part and." A further explanation was made of the process by an amendment as follows: "The heat is generated solely by the electric resistance of the particles of the granular body, exactly as in the case of an incandescent lamp by the resistance of the carbon filament to the passage of the current, and no other heat is employed at any stage of the work." Subsequently, by an amendment filed December 24, 1884, the specifications were changed, and in the matter of the specifications after such change occurred this passage: "To this end the invention consists essentially in the use, for metallurgical purposes, of a body of granular material of high resistance or low conductivity interposed within the circuit in such a manner as to form a continuous and unbroken part of the same, which granular body, by reason of its resistance, is made incandescent and generates all the heat required. The ore or other material to be reduced is usually mixed with the body of granular resistance material." In another part of the specifications it was stated that the degree of granulation might vary with the conditions of the case; and it was stated that the scope of the invention was not limited by the degree of granulation. And it was elsewhere stated that the proportions of ore and carbon would depend upon the character of the ore and the degree of heat required to reduce it, and that the degree of heat evolved would be determined by the resistance or conductivity of the mass and the strength of the current employed.

After stating that the matter of the apparatus was reserved for a separate application, entirely new claims were substituted for the original claims, three in number, of which the following is claim 1: "(1) The method of generating heat for metallurgical operations herein described, which consists in passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the material to be treated by the metallurgical process being brought in contact with or close proximity to the broken or pulverized resistance material, whereby the heat is generated by the resistance of the broken or pulverized body throughout its mass, and the operation can be performed solely by means of electrical energy." On February 14, 1885, the application was allowed; but, on the 20th day of March following, the case was withdrawn from issue in view of the prospective interference with another pending application, which turned out to be that of Bradley and Crocker, No. 158,805, specifically mentioned in the contract of May 18, 1885, and on April 10, 1885, such interference was declared. This was the state of the proceedings upon the application, at the date of the contract.

Another application by E. H. & A. H. Cowles was one filed February 24, 1885, being a divisional application founded upon that of December 24, 1884, just mentioned. It was for improvements in electric smelting furnaces. The details of construction suggested as embodying this invention were those enumerated in the main application, and the claims made thereon were for combinations of such apparatus. After some changes in the specifications and claims, it was announced at the patent office that the application was ready for allowance; but on May 1st it was declared that the case must be withheld from issue because of the fact that the main case was in interference with the Bradley and Crocker application, and on May 6, 1885, it was declared suspended to await the filing of an application by Bradley and Crocker upon their caveat which was found in the office. Notice of this suspension and the reason therefor was mailed to E. H. & A. H. Cowles, May 7, 1885, and this application of Cowles and Cowles stood in this plight on the 18th of May, 1885. Still another application was that of A. H. Cowles, filed May 15, 1885. It related to improvements in electric furnaces and methods of operating the same. The specifications delineated not only the apparatus, but also the method of operation. The apparatus consisted, substantially, of a containing chamber through the opposite sides of which the electrodes of a dynamo-electrical machine were inserted extending into the chamber towards each other so as to be in contact with the material to be reduced, and provided with mechanism whereby the electrodes could be pushed in so that the ends would be near each other or withdrawn to the wall of the chamber, as the requirements of the work to be per-

formed should indicate. The chamber also contained a lining of some substance which was a nonconductor of heat or electricity, a lining not made integral with the walls of the chamber, but packed in at the time of putting in the charge of material, or perhaps continued for successive operations. The process was one plainly indicated by the apparatus. The material which was to be subjected to the operation was stated to consist generally of intermingled ore, or metallic compounds, and carbon. Although it was stated in the specifications that the mingling of the carbon or other resistance material was generally done, it was also said: "But in some cases pulverized ore alone is used when it is a sufficient conductor of electricity." The claims also negative the necessity for the intermingling of the carbon or other resistance material. The material was filled into the chamber and covered with the lining material, provision made for the escape of gases, and the operation commenced by moving the points of the electrodes through the mass until they came sufficiently near each other so that the passage of the current would fuse the intervening or adjacent material. As soon as the fusion was started the electrodes were moved apart, gradually receding as the fusion progressed, whereby the mass of material between the electrodes acquired increased conductivity, until eventually the whole mass of material was brought within the influence of the current and melted down. The original claims as they stood at the date of the contract were for combinations of the apparatus only; but it should be noted in this connection that the specifications contained also the basis for a patent upon the process, and that eventually the patent did, in fact, issue for both, the first claim in which was as follows: "(1) The method of smelting ores and other substances by the incandescence of an electric material contained in said substances or mixed therewith, which consists in first bringing a limited quantity of the material to be treated between a pair of electrodes, and then gradually increasing the quantity of such material by causing the electrodes to recede from each other, substantially as herein set forth."

No proceedings in the patent office subsequent to the filing had taken place upon this application until after the 18th of May, 1885. On the other hand, there was at that time pending in the office the application of Bradley and Crocker, which claimed the invention by them of heating and reducing ores by electricity. That process was similar to that specified in the Cowles application of December 24, 1884, and is the one which was put into interference with that. It is not necessary to go into the details of that application, as there is no question material to the controversy relating to it. There was also then in the archives of the office a caveat deposited by Bradley and Crocker, February 26, 1884, which described the invention by them of an electrochemical or metallurgical process, in which the necessary "heat is produced and maintained by passing a powerful electric current either through the materials themselves which are undergoing treatment when these materials are conductors of electricity, or through separate conductors placed in the furnace, the energy of the electrical current being converted into heat by the electrical resistance of the materials or of the conductors through which it passes." The details stated in this caveat are of the apparatus employed and also of the mode of operation. In general, the apparatus consisted of carbon plates set in brick work and constituting the two electrodes. These electrodes were placed on opposite sides of the space containing the material, and there was a lining of the furnace consisting of nonconducting material. The mode of using the apparatus was by filling in the intervening space between the electrodes, and passing through it an electrical current in a way substantially like that already stated in the applications above described. In this caveat there was this passage: "We are about to make application for a patent for an invention resembling to a certain extent the one herein described, but in which the electric current we employ to produce the necessary heat in the furnace is also made to perform the function of electrolyzing a fused compound; that is, reducing a metal by the electrolytic action of the current that we employ to keep the bath in a state of fusion. But it is to be observed that in the invention described in this caveat the electric current by which we produce the required heat performs no electrolytic action upon the materials undergoing treatment, the reaction being purely chemical, and the function of the current being solely to develop the heat which is·a necessary condition of,

the reaction." This caveat is the one above mentioned, on account of which the application of Cowles and Cowles of February 24, 1885, was suspended on May 6, 1885. There was also pending in the office when the contract in question was made the Bradley application, upon which and its outgrowths the present controversy has arisen; and a somewhat particular statement of its nature, history, and then existing status seems necessary for the purpose of explaining the grounds upon which the conclusion here reached is founded. The application was filed by Charles S. Bradley, February 23, 1883. In it he stated that his invention was: "A new and useful improvement in the electro-metallurgical process," and it was said to relate "to the process of effecting the reduction of minerals or other compound chemical substances, while in a state of fusion, by the electrolytic action of an electric current; and it is especially designed for the extraction of metals from their ores or compounds, and their reduction to the metallic state." His method consisted of an operation therein described as follows: "Upon a hearth of brick or other suitable material is piled a heap or body of the ore, more or less pulverized, in the shape of a truncated cone, and a cavity or basin is excavated in the top of the heap to contain the fused portion of the ore which is to be treated electrolytically. In order to fuse the ore at the start, I bring the two electrodes into contact, separate them sufficiently to produce an electric arc, and then thrust them down into the ore lying at the bottom of the cavity or basin, where the ore soon fuses by the heat of the arc, and becomes a conducting medium or electrolyte through which the current from the electrodes continues to flow. The decomposition of the ore thereupon commences, the metallic aluminum being gradually deposited at the negative electrode, and the fluorine gas being set free at the positive electrode so long as the ore is maintained in a state of fusion; and I secure this result in my process by employing a current sufficiently powerful to develop the required heat in overcoming the resistance offered to its passage by the fused mass of ore, and, further, in having my electric generator or source of current so arranged that the strength of the electrolytic current may be properly regulated, and the mass of ore thereby kept at the proper temperature to obtain the most efficient electrolytic effect; or, in other words, to produce the largest yield of metal with the greatest economy in the electric current consumed." The claims were five in number, and were substantially as stated in claim No. 1: "The process of obtaining metals from their ores or compounds which consists in treating electrolytically a fused mass of ore contained in a basin or receptacle formed of the ore itself." On objection being made to these claims, Bradley, on April 8, 1885, amended his specifications, and substituted new claims. In his amendments, among other things, he inserted the words "or electro-chemical" after the word "electro-metallurgical" in the statement of the field of his invention, and placed, at the head of his communication to the office embodying his amendments, the title, "Improvement in Electro-Metallurgical or Electro-Chemical Process." And in respect to the incidents of his process he inserted the following statement:

"The arc, of course, ceases to exist as soon as there is a conducting liquid—the fused ore—between the electrodes, and the passage of the current then takes place through the fused ore by conduction, and the heat is produced as it is in an incandescent lamp. The arc is merely used to melt the ore in the beginning, and the ore is kept melted by incandescence, so to speak." Also the following: "It is obvious that other chemical and metallurgical processes may be carried on according to my invention in substantially the same manner as that I have described. It is also evident that various forms of furnace and built of various materials may be employed without departing from my invention." The substituted claims were for the process only, eight in number, the third of which is here stated: "(3) The herein described electro-metallurgical or electro-chemical process which consists in employing an electric current sufficiently powerful, not only to effect the electrolytic decomposition of the ore or compound treated, but also to develop by its passage the heat required to fuse said ore or compound or maintain it in a state of fusion." In no one of these claims was the initial fusion made an element or step in the process. The claims took up the process with the initial fusing already accomplished, adopting it as the datum from which the process described advanced.

On April 16, 1885, the claims were rejected upon references, especially to the detail of experiments of Sir Humphrey Davy in the Philosophical Transactions of the Royal Society. There were no other applications or caveats of Bradley and Crocker, or either of them, then on file. It is not deemed necessary to state the subsequent proceedings upon these several applications in minute detail; some of them are referred to in the opinion. It suffices here to state that the several Cowles applications were carried through to patents,—some of them after changes in the specifications and claims; and one of them in particular, that of A. H. Cowles, resulted in a·patent for not only the process, but also the apparatus in which it was conducted. Nothing was done after the contract was made by the Cowles Bros. in respect to the Bradley application, nor for the purpose of securing any rights in the invention stated in the Bradley and Crocker caveat; and Bradley himself did nothing further with his application for nearly two years thereafter, when, on April 13, 1887, he took up the proceedings again, and, after a protracted struggle—in which there were repeated rejections and amendments of the specifications and claims—in the patent office, finally obtained three patents. One of these, that upon his original application, was numbered 468,148, was issued February 2, 1892, and was for the process stated therein. It was said in the specifications, which had been amended in this respect during the progress of the proceedings, that "the body of unfused ore may either be formed into an unconfined pile, as in Fig. 1, or it may be contained in a receptacle or box, 6, of any desired shape, so as practically to form a tank or holder lined of the ore itself, as in Fig. 2. Such a lining will prevent the destruction of the holder, and the process may go on indefinitely without interruption." After describing his invention, he said: "I have described my process as preferably carried on by employing a body of the ore itself to form the basin or receptacle in which the electrodes are situated. between which the current flows through the ore for heating and electrolyzing the same. That specific invention, however, is not claimed herein, since it forms the subject-matter of patent No. 464,933, dated December 8, 1891. My present invention is not limited to the specific character of the receptacle nor the specific arrangements of the electrodes." Then follow the claims, of which the first was this: "(1) The process of separating or disassociating metals from their highly refractory ores or compounds, nonconductors in an unfused state, of which the ores and compounds of aluminum are a type, which consists in fusing the refractory ore or compound progressively by a source of heat concentrated directly upon it, rather than by an external furnace, and as it becomes fused effecting electrolysis by passing an electric current therethrough between terminals which are maintained in circuit with the fused bath, whereby the process is rendered continuous, substantially as set forth." Another of the patents obtained by Bradley was No. 464,933, issued December 8, 1891. It was entitled, "Process of Obtaining Metals from Their Ores or Compounds by Electrolysis," and was based upon a divisional application of his original application, the general description of the process being that contained in the original application, with modifications made during its pendency. One of the amendments in the specifications was this: "The body of unfused ore may either be formed into an unconfined pile, as in Fig. 1, or it may be contained in a receptacle or box, 6, of any desired shape, so as practically to form a tank or holder lined of the ore itself, as in Fig. 2. Such a lining will prevent the destruction of the holder, and the process may go on indefinitely without interruption." And he further expressly disclaimed the initial fusing by an electric arc as a part of this invention, in the following terms: "I do not herein lay claim * * * to the process of obtaining metals from their ores or compounds * * * consisting in first fusing the ore or compound by the direct passage of an electric current therethrough, and then, while maintaining the fused condition by said current, also electrolytically decomposing the ore or compound." And he also distinguished this invention from the one specifically embodying his electrolytical process, by stating that he did not "herein lay claim, broadly, to the process of obtaining metals from their ores or compounds consisting in maintaining the ore or compound in a fused or molten condition by the passage of an electrical current therethrough, and electrolytically decomposing such ore or compound," since, as he says, he had made those the subjects of another application. Claims 1 and 2 of this patent were as follows: "(1) The process of obtaining metals from their ores or compounds,

consisting in passing an electric current through a fused portion of the ore or compound contained in an unfused body or heap of said ore or compound. (2) The process of obtaining aluminum from its ores or compounds, consisting in passing an electric current through a fused portion of the aluminum ore or compound contained in an unfused body or heap of said ore or compound." Still another of the Bradley patents was No. 473,866, issued April 26, 1892, entitled, "Process of Obtaining Metals from Their Ores or Compounds," which states that it was "especially designed for the extraction of metals from aluminous and the like class of highly refractory ores or compounds, and their reduction to the metallic state,—for example, the extraction of aluminum from one of its ores, say cryolite." In his application, in addition to the apparatus provided in his original specifications, he states that he employs an auxiliary source of heat in the nature of blowpipe or similar flame projected upon the material in the vicinity of the electrodes, and keeping up the fusion in that way. The nature of this patent is disclosed substantially by the following, claim 1: "(1) The herein described process of obtaining metals from aluminous and the like class of highly refractory ores or compounds, which consists in fusing, and, when fused, establishing an electric current through a bath of the material to be treated, and by such current, together with a blowpipe flame or other auxiliary source of heat concentrated directly upon the material treated, rather than through the walls of a furnace or crucible, maintaining the fused bath of ore constant, and electrolyzing the same, as set forth." During the progress of the suit Grosvenor P. Lowrey died, and it was revived in the name of his executor, Francis P. Lowrey, who is the appellee in this court.

Loren Prentiss and E. N. Dickerson, for appellants.
Robert S. Taylor, for appellee.

Before LURTON, Circuit Judge, SEVERENS, District Judge, and HAMMOND, J

SEVERENS, District Judge, having stated the case as above, delivered the opinion of the court.

The first of the questions presented by this record relates to the application of the rules of evidence in respect to the competency of proof of the prior and contemporaneous parol negotiations of the parties, for the purpose of affecting the construction of the contract. The competency of such evidence depends upon the nature of the proceeding and the purpose for which it is offered. If the proceeding is for the purpose of reforming the writing so that it shall truly express the intentions and purposes of the parties, such evidence is no doubt admissible, for in such a case the primary object is not to construe the contract, but to ascertain what the real contract was, to the end that, if the writing fails to express it, it may be reconstructed so that it shall do so. On the other hand, if the purpose of the suit is to enforce a written contract, whereby the writing is accepted as it stands and admittedly expresses the intentions of the parties, the general and familiar rule applies that such prior and contemporaneous negotiations are not admissible to affect the construction of the writing. This rule is founded upon the presumption that the parties have gathered in and finally put in form the result of the negotiations, the obvious purpose of the writing being to express in a definite and authentic form their final conclusions. The general rule just stated does not, however, exclude proof of the facts and circumstances showing the situation of the subject-matter, and the relations of the parties thereto, or other facts and circumstances tending to throw light upon those subjects.

Such matters stand upon a different ground from the mere negotiations of the parties relating to the terms of the contract. In the present case the suit was not brought for the purpose of reforming the contract, and no question is made but that it is in the form and language in which the parties intended it. Both parties stand upon it as written, the controversy being only as to what the writing means upon the proper interpretation of its language. There is considerable evidence in the record to which the court can therefore give no weight, which relates to their negotiations before and at the time of the signing and delivery of the written contract. But we may regard such evidence as shows to us the situation of the matters contracted about, and how the parties stood in relation to them. The most material facts thus shown in the present case are embodied in the preceding statement.

Coming, now, to the interpretation of the contract, it is contended on the part of the appellee that Bradley and Crocker, the parties of the first part in the contract, agreed to sell only such of their joint property as fell within the description of the subject of their grant, that no express mention was made therein of any individual property of either of them, and therefore that Bradley's individual application did not pass. On the other hand, the appellants insist that the general language employed, when considered in the light of the evident purpose and the reasons of the parties actuating them, includes, not only the joint property of Bradley and Crocker of the kind described, but also the individual property of each of them of the same kind, by plain intendment. The court below held that the latter was the proper view to be taken of the question, and in that we concur. Undoubtedly, if there are in any such case no circumstances which would change the primary grammatical construction, the terms employed would support the appellee's contention; but the grammatical rule raises only a prima facie presumption, and does not preclude the settling of the meaning by detracting somewhat from the exactness of the language in order to give effect to more cogent reasons of another sort. And the cases are very numerous in which this principle has been applied, and the plural language of the agreement has been held to cover and include the singular also. "If two persons have goods in jointure, and give all their goods, not only those they have in jointure, but their several goods also, pass." The substance of the rule is stated in Co. Litt. 197a, and several cases are cited in the opinion of the court below in illustration and support of it. Justice Windham's Case, 5 Coke, 7b; Wharton v. Fisher, 2 Serg. & R. 182; Williams v. Hadley, 21 Kan. 350; Judd v. Gibbs, 3 Gray, 539; Von Wettberg v. Carson, 44 Conn. 289; Coffin v. Douglass, 61 Tex. 406; Shoe Co. v. Ferrell, 68 Tex. 638, 5 S. W. 490; Bank v. Beede, 37 Minn. 527, 35 N. W. 435. The general rule above invoked is one which is applied also in the construction of statutes. Black, Interp. Laws, 154, and the instances there given.

It is conceded by counsel for the appellee that the reference in another place in this contract to "applications for patents made by E. H. & A. H. Cowles" would include the application which

was made by A. H. Cowles alone, although he says that if he were disposed to stand upon a small point of verbal criticism he could say that the latter application was not within the terms of the agreement in controversy. We think that is a just as well as frank concession, and that the reason for it is equally applicable to the construction of the language we are now considering.

Much stress is laid by the appellee upon the fact that the contract of May 18, 1885, did not in terms enumerate as coming within the grant the Bradley application, notwithstanding that it had been brought to the notice of the Cowles Company by the reference thereto in the Bradley and Crocker application, which was present at the time when the contract was made. This reference to the Bradley application was made for the purpose of stating the difference between that and the Bradley and Crocker application. In the reference, the general characteristic of the Bradley invention was stated, but not the details; and it is now strenuously insisted that the omission of any special mention in the contract of the Bradley application, whose existence was known, in connection with the fact that the Bradley and Crocker application is specifically mentioned, furnishes strong evidence that it was not intended by the parties that the Bradley invention should pass; and this consideration appears to have had great weight with the court below in determining the construction which ought to be put upon the contract.

Now, one of the applications of Cowles and Cowles, for a patent for improvement in electric smelting furnaces, which had been filed on February 24, 1885, was pending at the time of this contract. The details of the apparatus proposed by it were those suggested by their previous application, filed December 24, 1884, of which the one now mentioned was a divisional application. The claims were for combinations of such apparatus. After some changes in the specifications and claims, it was declared at the patent office to be ready for allowance on May 1, 1885, but it was at the same time declared that the case must be withheld from issue, because of the fact that the main case was in interference with the Bradley and Crocker application. And a little later, on May 6th, this Cowles application was declared suspended, because of the following facts stated in a notice directed to Cowles and Cowles, which stated that "the caveat of C. S. Bradley and B. F. Crocker, pending at the date of the filing of this application, is found to cover substantially the apparatus herein claimed; and, as provided by rule 196 the caveators have been notified to file a complete application. This application must be suspended in view of the above action." This notification was mailed to Cowles and Cowles on May 7, 1885, and, by due course of mail, must have reached them a week or more previous to the date when the parties met and concluded the agreement of May 18th. And its previous reception was probably the reason for the mention of caveats as one of the class of things desired by the Cowles in a letter written to Bradley and Crocker, May 11, 1885. The Cowles brothers must, therefore, have had quite as ample notice, not only of the existence of the caveat, but of its sub-

stantial nature, as they had of the Bradley application and its contents. The Bradley and Crocker caveat, therefore, stood directly across the path of one of the Cowles applications, and was obstructing the path of the applicants in the same way that the Bradley and Crocker application was obstructing that of another one. Yet the caveat was not distinctly mentioned in the contract, and is not included, unless it is included in the general terms. No one can doubt that the caveat must be regarded as within the scope of the contract. It is obvious, therefore, that the parties cannot be deemed to have excluded inventions and claims simply because they knew of their existence and did not include them in terms.

The above-mentioned argument of the appellee appears to have had much weight with the court below in determining the proper construction to be put upon the contract; for, as we gather from the opinion there given, it was the main consideration upon which the court held that the parties did not actually suppose that Bradley's invention was included. 68 Fed. 368. It is probable that the condition of the case on the application of Cowles and Cowles of February 24, 1885, at the date of the contract, was not brought to the attention of the court, as no reference was made thereto in its opinion. The manner in which this caveat was dealt with in the contract confirms the impression which is strongly induced by the general and sweeping terms of the contract as a whole when construed in the light of existing facts, that impression being that it was the purpose of the parties to bring under the operation of the contract every existing thing in the nature of inventions and applications which might tend to defeat any of the Cowles inventions and applications. Again, it is urged that the reference to the Bradley application in that of Bradley and Crocker indicated to the Cowles brothers that the Bradley invention was so far off from their own that it was of no importance for them to acquire it, but we do not think that such was the probability. On the contrary, we think that that reference bore on its face the signal of danger. It is stated that in that application Bradley had described "an electro-metallurgical process in which an electric current is employed to perform two functions: First, to effect an electrolytic disruption of the materials treated; and, second, to supply the heat necessary to maintain said materials in a fused state while they are being electrolyzed." Now, to a man having the familiarity with the subject which the Cowles brothers possessed, it was apparent that this process contemplated an operation which in its nature essentially consisted of a transposition of the two operations mentioned in this reference; for the material must first be fused before the electrolytic disruption could occur, that being necessarily a secondary effect. They knew that in their own applications for a similar process it had been stated that in some circumstances, depending upon the conductivity of the materials treated, no carbon or other independent material was employed as an agent in the operation, but the process was performed by the direct application of the current to the subject-matter to be reduced. It seems to us, therefore, that, if there is any inference to be derived from the probabilities

of the case upon this aspect, it is clearly against the party who now seeks to make use of it.    The result is that it must be held that the individual application of Bradley then pending in the patent office was included in the grant, if it is, in other respects than with regard to its ownership, within the description of the things intended to be conveyed.

A point is made upon the descriptive words of the grant, "discoveries and inventions relating to electric smelting processes," and the endeavor is to establish that Bradley's process is not correctly described if we designate it as "electric smelting," and therefore was not included.    But we think it was an apt and proper description of it.    It was performed by electricity, and that was the feature of it which distinguished it from the old methods of reducing ores.    By using the current the ore was "smelted."    By the definitions of the dictionaries the word "smelting" is shown to be sometimes employed to signify simply "melting," "fusing," and sometimes, and more commonly in its practical sense, to mean the reduction of ores by melting them in the presence of some agent which would react upon the compounds of the ore when fused, and thereby separate them.    Such a reagent is carbon.    But if in Bradley's process the one agent performed both functions by melting and decomposing the ore, we can see no reason whatever for giving it a name which should also indicate the secondary effect in the process any more than it was necessary in the old art to include it in the designation.    The term "electric" sufficiently distinguished it from the older method, for in itself it carried the idea of fusing and electrolyzing, both being its well-known functions.    Because a different agency was employed to effect one of the things done in the operation would not alter the general character of the whole process, to which the comprehensive characterizing of "smelting" in the sense of "reduction" would fitly be applied.

The Bradley process was not less appropriately described as an electric smelting process than that of Siemens by the electric arc. At the hearing there was exhibited to us the work of Dr. Urbanitzky, originally in German, entitled "Electricity in the Service of Man."    This was subsequently edited by Dr. Wormell, and was republished in English with an introduction by Perry, in 1886, at London and New York.    In this work Siemens' process is described as "electro-smelting."    The indications are quite strong that the court below was in error in supposing that even as early as 1885 the process of reducing metals by electricity was not denominated "electro-smelting."

This brings us to the question of the interpretation of the following language in the contract:

"And all applications now pending and caveats on file in the United States patent office relating to electric smelting processes and furnaces which do or may interfere with any application for patents made by Eugene H. Cowles and Alfred H. Cowles, of Cleveland, Ohio, now pending in the United States patent office."

It is urged upon us that we should accept as a test in the construction of this language that the parties intended it to be em-

ployed in a sense restricted to its technical signification,—such a signification as would be given to the same expressions in the patent office. This is based upon the suggestion that they were scientific men dealing with a scientific subject in the crisis of an interference. But, when we attend to all the circumstances, we doubt whether such a mode of dealing with the construction of the contract would be just, although in the end it does make a vital difference whether we adopt the test suggested or not. It is to be observed that one of these parties was a corporation which was just being launched upon a manufacturing business. The patents which it was expected would be obtained upon the inventions which it had secured were an adjunct necessary to their business operations. The company was buying its peace, and endeavoring to obtain and secure an indubitable title to the inventions which they intended to employ. They were not engaged in a hand to hand contest in the patent office or in the courts. They were endeavoring to so shape their affairs as to relieve themselves from the necessity of making such contests. They stood outside of any such place of controversy, and were dealing with the subject-matter on business principles. For these reasons we think there is much reason for believing that when they employed the general language, all inventions and discoveries, patents, applications, and caveats, which did or might interfere with their own applications for patents, they intended to gather in all which the other party had which would furnish any reasonable ground for claiming that they infringed. These facts and reasons are equally well calculated to show that the other party had an equivalent intention in making the grant; or, at all events, that they must have known that that was the understanding of the grantee when they closed the contract, and this would bind them to the agreement having that interpretation. It is a well-established doctrine that a party must be deemed to have assented to the contract in such a sense as he knew the other party intended it to signify, provided the language employed is capable of such a meaning. And we have no doubt that for the purpose of construing this contract we must suppose that the parties intended to deal with existing things, and in the form and character in which they existed. The leading purpose was to clear the way of all obstructions, so that the Cowles applications might proceed without any contest on the part of the other parties, with whom they were making the contract. It is difficult to suppose that these purchasers were intending to secure what might ultimately be determined to interfere with or defeat their claims, either upon a contest in the patent office or by judicial decree, as the result of litigation. It would rather seem that the proper test to be applied in the solution of the question, whether any invention or any application is to be included within the terms of the grant, is this: whether the invention or application was of such a character that it might interfere with the prosecution of their own applications; and by that we mean, of course, not an obstacle which had no substance or foundation on which a contestation could reasonably be based, but such as would furnish a reasonable ground for raising a con-

troversy. We do not find it necessary, however, to give the contract so broad a scope. In our opinion it did, without doubt, include all inventions and applications of Bradley and Crocker which would in fact afford sufficient ground for declaring an interference or would tend to defeat a patent on any of the Cowles applications if such a patent should, without any declared interference, be issued. Any other construction more favorable to the appellee would tend to defeat the leading and manifest purpose of the whole transaction.

The appellee contends that the words "which do or may interfere" have relation back to all of the preceding subjects of the grant, and include the words "discoveries and inventions." On the other hand, the appellants contend that they refer only to the words immediately preceding, "and all applications now pending and caveats on file in the United States patent office relating to electric smelting processes and furnaces." It must be confessed that the question is somewhat doubtful. In support of the appellants' contention that it relates only to the immediately antecedent words, it may be observed that it was known that there were applications and a caveat of the other party on file in the patent office relating to the subject. They also had in mind that the Cowles brothers had applications there. These properties were, therefore, of the same sort. And if we were to assume that the parties were dealing, as contended, "in the atmosphere of the patent office," the language employed would be apt and technical to describe the things "which do or may interfere"; whereas, using the language in the meaning which it has in the patent office, it would be a bungling and unusual expression to speak of "discoveries and inventions" as interfering. But as we are not disposed to interpret this contract strictly in the way in which such terms would be employed in the patent office, for reasons which are elsewhere explained, we are inclined to think, upon consideration of the leading object which the parties had in view, which was to clear the way for their own inventions and applications, that the limiting words "which do or may interfere" were intended to apply to all of the things granted, which are mentioned in this paragraph, except perhaps the Bradley and Crocker application mentioned in the subsequent clause. For this reason it becomes necessary to determine whether the Bradley application was one which did or might interfere with any of the Cowles applications.

We are not required to pass upon the validity of the patents involved in this suit, or of any of them. There is no issue of that kind before us, and we shall go no nearer to such a decision than the determination of the issue here made requires. The comparison of one patent with another, for the purpose of determining their substantial identity, is essentially one of a comparison of claims, though the specifications may be referred to, within limited bounds, for the purpose of construing the claims themselves. As we think that the contract in question must be deemed to refer to things as they then existed, we think the comparison should be made of the specifications and claims made by the parties as they stood at that

time, though we may refer to what has since been done upon the footing of those applications as illustrating their capacity. Considering that no patents had been issued, and the claims might be modified and put in any form which the specifications warranted, it is necessary to examine the specifications themselves for the purpose of showing what the real nature of the application was, and it is not of immediate consequence what the then pending claims were. Referring to the original application of E. H. and A. H. Cowles, filed December 24, 1884, it is seen that the invention related to improvements in electric furnaces and also the method of operating them. The general idea disclosed was that of the reduction of metallic ores and compounds by passing an electric current therethrough. In carrying out this general purpose it was stated that the material to be treated should be pulverized and mixed with pulverized carbon, but it was also stated in the specifications that the carbon need not be supplied where the ore or other material being treated had sufficient conductivity whereby to carry on the operation. Taking these two parts of the specifications together, it resulted in this: that the carbon would be used wherever it was found to be a necessary adjunct, and this would depend upon the particular ore or compound that was being reduced. The employment of the carbon was not, therefore, made an essential part of the process. And, further, by an amendment which had then been made, the proportion of carbon in any case had been made indeterminate. By another amendment the degree of pulverization was rendered immaterial.

In the claims as they originally stood, the third claimed simply "for a combination with the two electrodes placed at opposite sides of the furnace chamber of a mass of granular or pulverized material interposed between the same." The sixth was "for a process which consisted in pulverizing the ore and introducing the pulverized ore in a dry state within the circuit of an electric current, by means of which the ore is reduced." These claims, however, were introduced before the amendments above referred to were made. Thus it will be seen that the specifications were of such a character as that it was competent, upon the basis of them, to claim the process of reducing metallic ores or compounds by bringing them between the electrodes of a dynamo-electrical machine, and passing through them the current, using carbon or not, as the character of the material made expedient. Whether such claims would be valid or not, it is not necessary here to inquire. Even before the making of the contract, such claims were in fact made in the applications; and there can be no question that the parties engaged in the purchase and sale of these inventions and applications, for the purpose of taking them out of the way, apprehended that such claims might properly be made and were tenable.

Referring, next, to the application of February 24, 1885, by the Cowles brothers, it is found to have been a divisional application, founded upon the one just considered. This was for so much of the invention stated in the original specifications as related to the apparatus. The matter of it is not very material to the present purpose, but it illus-

trates the flexibility of the proceedings in the patent office upon applications for patents therein pending, and it related to a class of inventions where the apparatus suggests the process.    Another application was filed by A. H. Cowles, on May 15, 1885.    It related to improvements in electric furnaces, and the method of operating the same, and the specifications showed both the apparatus and the method.    Thus, although his claims were for combinations of the apparatus, the specifications also contained the grounds for a patent for a process; and, eventually, the patent issued upon this application actually covered both the apparatus and the process.    Let us turn for a moment to these claims which were finally allowed and made the substance of his patent.    It is material to observe in this connection that both in the specifications and claims of this patent the necessity for mixing carbon or any equivalent substance with the ore was expressly negatived; for he states in the specifications that "this [referring to the charge] consists ordinarily of electrical resistance material, such as electrolyte carbon, and the ore to be reduced, * * * but in some cases pulverized ore alone is used, when it is a sufficient conductor of electricity."    And his first claim was "for the method of smelting ores and other substances by the incandescence of an electrical resistance material contained in said substances or mixed therewith, which consists in first bringing a limited quantity of the material to be treated between a pair of electrodes, and then gradually increasing the quantity of such material by causing the electrodes to recede," etc.    The same observation may be made upon this as was made upon the application filed December 24, 1884, viz. that the employment of the carbon was not made essential to the process, but was left to the various requirements of the use, and the extent of its employment left to the judgment of the operator.

Considering next the Bradley application of April 23, 1883.    It is seen to have been for an electro-metallurgical process.    The first step in the process which he described consisted in piling upon a hearth a heap of ore in the form of a truncated cone, making a basin in the top of the heap.    He then took the two electrodes connected with the wires running from the dynamo-electric machine, and, bringing them near together, plunged them into the ore at the bottom of the basin, where, by reason of their proximity, an electric arc would be formed producing intense heat, and thereby melting the immediately adjacent material.    As the ore melted, the electrodes were moved farther apart, whereupon the arc ceased, and the current, instead of passing between the lumps or granules of the material, passed through the mass which had become melted, whereby heat was generated serving to keep the mass molten; the result of which would be to melt down the other parts of the ore adjacent to that already melted, the electrolytic action of the current going on simultaneously after the initial fusion by the arc had been accomplished.    According to the idea of the inventor, the concurrent fusing of the mass and the electrolyzing of the same would be continued until the operation ceased.    It was also suggested that the operation might be continuous, and only needed the addition of fresh ore.    He also indicated in his specifications an advantage in thus fusing the ore within a

body of ore which remained unfused, in that it saved the walls of the crucible or other containing vessel in which such operations had generally been performed from the very serious corrosion, cracking, and crumbling resulting from the action of liberated gases and the intense heat. Taking this process all in all, it would seem, at least to one not thoroughly acquainted with what had already been accomplished in the reduction of ores and metallic compounds by electricity, to have been one of great merit. But the researches of Sir Humphrey Davy, Siemens, and other scientific men had already made a considerable advance in developing this new art. This application of Bradley's contained matter upon which were founded claims of many sorts, and was divided into three distinct lines; but up to May 18, 1885, it continued a single application. The claims appended originally to this application made no mention of any method of initially fusing the ore, but started the process upon which his claims were founded by treating the mass of ore as already fused, as is shown by his claim 1, which in this respect is a sample of all: "(1) The process of obtaining metals from their ores or compounds which consists in treating electrolytically a fused mass of ore contained in a basin or receptacle formed of the ore itself." What appears prominent in the above specifications and claims was Bradley's idea of employing the electrolytical power of the current to the ore, whereby the metal sought was disrupted from its compounds. It is evident that he did not himself fully understand the peculiar details of the action of the current upon the material; and he seems to have supposed that some other agency was at work than mere heat and atomic disruption thereby, or, if not, that some chemical agency was in operation; for he changed the statement of the general character of his invention by adding the words "or electro-chemical" after the word "electrometallurgical" as it originally stood, and also said: "It is obvious that other chemical and metallurgical processes may be carried on according to my invention." But this is not very material. He also amended his specifications by saying: "It is also evident that various forms of furnace, built of various materials, may be employed without departing from my invention." He amended his claims, and it is important to refer to these claims as amended, in determining what the parties intended to sell to the Cowles Electric Smelting & Aluminum Company, for they were the existing claims at that time. The first claim was simply "for a process in which the required heat as well as the electrolysis is produced by means of an electric current or currents." The second "for the process of electrolyzing materials in a state of fusion in which the heat required is produced or supplied by means of the current which is employed to effect the electrolysis." The third: "The process which consists in employing an electric current sufficiently powerful, not only to effect the electrolytic decomposition of the ore or compound treated, but also to develop by its passage the heat required to fuse said ore or compound and maintain it in the state of fusion." The rest of the claims were of a somewhat similar character, with some slight changes, except that in some of them he included the unfused surrounding ore as a receptacle in which to carry on the process.

We might stop here for the purposes of the intended comparison, but the subsequent history of this application and its final development is proper to be considered for the purpose of showing what interference with the Cowles applications this application of Bradley's and the invention supposed to be embodied in it might create. In 1887 Bradley again took up the proceedings upon his original application. It was divided into three, two offshoots from the original having been started, and all three were carried through to patents. It would be tedious to follow each successive step. The application went through successive metamorphoses, until it finally emerged in three separate patents; but there was continuity of the essence of the invention. The patent issued upon the original application was for a "process of separating metals from their highly refractory ores, nonconductors in an unfused state, which consists in fusing the ore progressively by a source of heat concentrated directly upon it rather than by an external furnace, and, as fusion takes place, effecting electrolysis by the electric current carried through it." The use of the body of the ore as the receptacle in which the process should take place was expressly stated to be not claimed, and so, also, the specific arrangement of the electrodes. The patent issued upon the first divisional application struck off was for a process of obtaining metals from aluminous and similar ores or compounds, and consisted in fusing and when fused establishing an electric current through a bath of the material to be treated, and by the current and some auxiliary source of heat all concentrated directly upon the material treated, rather than through the walls of a furnace or crucible, maintaining the ore in fusion and electrolyzing it. In the specifications the receptacle in which the process should occur was expressly excluded, though a lining by using the unfused ore for that purpose was retained, and it is again stated that other chemical and metallurgical processes might be carried on according to that invention in substantially the same manner.

The patent founded upon the second of the divisional applications was, quoting the first claim therein, for: "(1) The process of obtaining metals from their ores or compounds consisting in passing an electric current through a fused portion of the ore or compound contained in an unfused body or heap of said ore or compound." It was stated in the specifications that the body of unfused ore might either be formed into an unconfined pile, or in a box or tank lined with the ore itself, and it was stated that by adding to the mass of the ore the process might go on indefinitely. There is no mention of the initial fusing as one of the steps of the process, and there was an express exclusion of it in the statement preliminary to the claims. That process, including such initial fusing, was made the subject of another patent, which latter fact has been already shown by the reference to the patent which we have just previously considered. Nor is there any mention made in the first two claims of any electrolyzing process, unless it is to be implied as a result of passing the current through the fused ore. These claims speak of the process being performed in the material contained "in an unfused body or heap of ore." As the containing ore serves

only the purpose of a receptacle, it would seem that so much of the claims is merely structural. When employed as the lining of the tank according to the specifications, the unfused ore performs precisely the same function as the lining of the tank in the Cowles patent, 319,945, which is for a structure and not for a process. But we will not stop to dwell upon this.

Recurring to the situation of the applications of the several parties, it is impossible for us to hold that the Bradley patent was not or might not constitute an interference with any of the Cowles applications. Without referring to all of the points upon which collision might occur, and we think in fact existed, it will be sufficient to compare the applications of A. H. Cowles and its original claims with that of Bradley, as his application stood when the contract with which we are dealing was made. We have already pointed out the characteristics of these two applications. In each of them the process consisted of reducing ores and metallic compounds by depositing the material to be treated between the electrodes of a dynamo-electrical machine, and passing therethrough the electric current. After the initial fusing,—which for the purposes of the comparison may be laid out of the case, because it was not made essential to the Bradley claims as they then stood,—the melted ore in the Bradley process between the poles became the same electrolyte as in the Cowles process, when the latter process was applied to ores or other materials possessing in themselves sufficient conductivity, and probably also when applied to ores or materials with which carbon or some equivalent substance would be advantageously intermixed; because we are satisfied that in this Cowles process, whenever the carbon should be employed, after the initial fusing the current would pass between the electrodes in large measure through the fused ore by reason of the breaking up of the continuity of its paths through the carbon by the progressive destruction of the carbon and the gathering of the metal upon the surfaces of the granules, and because also the paths thus made would offer less resistance to the current than the surrounding mass of carbon and unfused ore; and more especially would this be so if the process was applied to the reduction of highly refractory ores, where the great heat to which the materials must be subjected would render the conductivity of the molten mass approximately that of the carbon, and thus the carbon and the material would become a homogeneous mass with respect to its conductivity. But, be that as it may, it is enough that with respect to the two processes they were not only alike, but identical, in some of their applications. It is said that there are no ores with respect to which the Cowles process would be a successfully operative one without the carbon. But, if the initial fusing be ignored, Bradley's must be equally so.

Referring again to the first claim of the patent to A. H. Cowles, it is readily seen that it in fact includes the whole of Bradley's process, initial fusing and all. "It consists in first bringing a limited quantity of the material to be treated between a pair of electrodes." He says, in his specifications, that at the start the electrodes are placed near together. This is exactly what Bradley did, and for

the same purpose. It is not material to know whether, at this stage, the current passes in these processes by an arc or not. The step in the process being the same, and the result the same, it is inferable that the mode in which the current passes is the same in both processes. Then, following the above quotation of the Cowles claim, he adds: "And then gradually increasing the quantity of such material by causing the electrodes to recede from each other." This again is what Bradley does, and these two steps constitute the substance of the process of each of them. Suppose that Bradley had never disclaimed the initial fusing, and had obtained only a patent for his process including that, and Cowles under his patent had gone into the business of smelting ores which do not require the aid of carbon, can it be doubted that he would have infringed the Bradley patent? It is difficult to see how anything even plausible could be said in his defense.

Strenuous effort is made by counsel in behalf of appellee to demonstrate that the leading idea of the Cowles application consisted in the distinctive part of his process which employed the use of carbon intermingled with the ore to serve as a resistance material to generate heat, or to act as a chemical reagent to absorb the extraneous compounds. We think it may be doubted whether this was so, being made, as it was, a contingent element in the process. But, assuming it to be so, it must be answered that, although it was the leading idea, that idea did not constitute the limits of his invention any more than Bradley's idea of initial fusing by the electric arc, or the use of the unfused body of the ore for a receptacle, or the electrolytical process of Bradley, constituted his invention. As a matter of fact, we have no doubt that Bradley's leading idea was the application of the electrolytical agency of the current in his process; but, if it were held that the other features of his invention were thus to be excluded, it would make havoc with most of the claims in his patents. And we are constrained to think that too much importance was attached in the court below to the results of the comparison of the supposed leading ideas thus made. The efficiency of the electric current to break up and separate the chemical compounds of a fused mass of ore by maintaining the current through it is a faculty of the current itself, inherent and indivisible. Bradley's idea of separating it from the factor itself, and exalting it into an independent element or step in his process, was a merely fanciful one. The actual process which he described necessarily involved it, just as the Cowles process also did. The process being the same in other regards, and all the conditions being substantially alike, the electrolyzing energies of the current would operate in a similar manner and produce the like results. Counsel for the appellee states the plain truth when he says that "the passage of an electric current through a fused metallic compound is bound to produce electrolysis in amount proportional to the volume of the current passing."

There is no room for distinguishing them in this respect. It was not necessary that Cowles should have known how the current acted in effecting the reduction, or what peculiar power or energy

of the current effected the result. Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073. The patentee of an invention of a process is entitled to the benefit of all which his process will accomplish. Discoveries of natural forces or of their laws are not the subjects of patents. It is only the employment of such forces by invented means, for useful purposes, which gives the inventor any standing ground. O'Reilly v. Morse, 15 How. 62. And an inventor is entitled to claim for all the capabilities of his process, however prominent he may have made any single idea embodied therein. Further, to distinguish between these leading ideas, it is urged that the idea prominently set forth in Bradley's application was that of the employment of electrolysis in separating metals from the other elements in ores and compounds, and we are satisfied that the fact in this regard is as claimed, and that Bradley had conceived the idea of promoting this agency of the electric current, and making it the characteristic feature of his invention. But we think there is nothing of substance in it which saves his invention from interference with the Cowles patent. Inasmuch as the Cowles process necessarily employed the electric current, it necessarily employed that which was inseparably incident to it.

Disregarding, then, the initial fusing, which Bradley himself disregarded in his original claims, and as well also in the claims in some of his patents; and disregarding the employment of the carbon resistance material, as Cowles did in some of his claims; and seeing also that electrolysis is not an element, but a mere incident, to one of the factors employed in both the Cowles and Bradley inventions,—we should find that their processes were not merely similar, but identical. But complete identity is not necessary. As was stated by Mr. Justice Curtis in Winans v. Denmead, 15 How. 330:

"If the machine complained of were a copy, in form, of the machine described in the specification, of course, it would be at once seen to be an infringement. It could be nothing else. It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to questions; and the property of inventors would be valueless, if it were enough for the defendant to say: 'Your improvement consisted in a change of form; you describe and claim but one form; I have not taken that, and so have not infringed.'"

This was said in a case where the original patent was for a cylindrical ore body in a railroad car, where the structure held to infringe was hexagonal. But it is equally applicable to inventions for processes. The patentee is entitled to claim, not only that which he precisely claims, but, where he claims for a combination or process embodying the use of certain elements, his claims will include such combinations and processes as adopt substantially the same means; where the variation is only such as common intelligence in that art would suggest. Incidental appliances in operating the substantial means invented would not prevent a second patented invention from infringing upon the first. The language of some of the Bradley claims is broad enough to admit the admixture of carbon, if his invention was a primary one, and the employment of carbon was a mere auxiliary of the current in effecting the reduction, according to the doctrine of Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299; Proctor v.

Bennis, 36 Ch. Div. 740; McCormick Harvesting Mach. Co. v. C. Aultman & Co., 16 C. C. A. 259, 69 Fed. 371; and kindred cases.

This record is not made up for the purpose of enabling the court to decide how far the Bradley invention advanced the prior art.    If it was all he claimed for it, it first supplied the efficient means of reducing to the service of the public an agency of great power and value in a highly important industry.    To such an invention the courts will give precedence according to its breadth, and will treat all modifications of it which involve only the exercise of the ordinary skill and learning of that art as comprehended in the invention.    And having regard to the Bradley patents, it seems not too much to say that if the claims are valid for what they import, and so have priority in the field occupied by them, they would be entitled to a large privilege.    The testimony before us shows that, when the Cowles brothers brought out their invention designed for a similar purpose, its novelty and importance were recognized by scientific and practical men, and it was made the theme of discussion and congratulation in learned societies.

The rule to which we have above adverted is illustrated by the well-known case of Tilghman v. Proctor, 102 U. S. 707, in which the patent alleged to have been infringed was for a process of obtaining fat acids and glycerine from fatty substances.    In describing his process Tilghman had stated that it consisted of subjecting a mixture of fat and water in certain proportions to the action of heat and pressure.    After deciding the patent to be valid, the court considered the defense of noninfringement.    There were several grounds taken by the defendant in support of that defense, one of which was that the defendant added to the mixture of fat and water from 4 to 7 per cent. of lime, which it was claimed stimulated the union of the elements in the mixture.    This it was claimed distinguished their process from that of the complainant.    But this contention did not prevail.    The court, by Mr. Justice Bradley, said:

"They use water in admixture with fat, heated to a high degree, far above the boiling point, and yet subjected to such pressure as to prevent the water from being converted into steam; and though they may also use other things at the same time, which other things may facilitate the operation, or render a less degree of heat necessary than would be required when water alone is used, and thus actually improve the process of Tilghman, yet this process is included in their operation, and forms the basis of it.    It is idle, therefore, to say that they do not infringe Tilghman's patent.    It is unnecessary to determine what precise part the lime used by the defendants plays in their process; whether, as the complainant contends, it saponifies the fat to a certain extent, leaving the remainder to be acted upon by the water alone purely after the process of Tilghman; or whether, as the defendants contend, the lime produces a more perfect and active commixture of the fat and water, or predisposes the fat to unite with the requisite elements of water necessary for producing glycerine and the fat acids.    In either case, the process of Tilghman, modified or unmodified by the supposed improvement, underlies the operation performed in the defendant's boilers."

And in the case of the driven-well patent (Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073), which was also for a process, there was a similar ruling.    The suit was brought upon a reissued patent.    One of the defenses was that the claim sued on was broadened in the re-

issue. This was rested upon the fact that the original specifications and claims in express terms limited the process to "places where no rock·is to be penetrated," whereas in the claim of the reissued patent there was no such limitation. But the court held there was no substantial difference between the two when read with reference to the subject-matter and,in the light of facts known to those informed upon the subject. It was known that, if rock should be met with in driving, the process must be supplemented by drilling, which, although a distinct operation, was one which would occur to the common understanding as a means of helping out the operation when that was embarrassed·by unusual difficulties. And it was held that this did not change the substantial nature of the process. Said the court, by Mr. Justice Matthews:

"It does not follow, either from the amended or the original patent, that a driven well, according to the process described, may not be constructed and operated, notwithstanding in its construction some rock has to be penetrated. There may be a layer of rock on the surface. When this is removed or cut through, a driven well may then be constructed in the space thus uncovered from the obstruction. So, if a stratum of rock is met in the course of driving the rod or tube, that layer may be penetrated, not by driving the rod or tube through it, but by other usual means of boring and drilling. After it is passed, the rod or tube, having been inserted in the opening made through the rock, may then be driven in the usual manner through the remainder of its course until it reaches a water-bearing stratum of earth, as if no rock had been met in its passage."

Taking the drawing accompanying the Cowles specifications, which illustrate not only the apparatus but by clear suggestion the process itself, it is evident that a person ordinarily skilled in the art would have no difficulty in constructing it upon the specifications of the Bradley application. There is a box or tank having a lining for the purpose of saving the walls from injury, the two electrodes running through the opposite sides of the box and made adjustable so that their extremities could be brought close together or moved apart as the requirements of the operation would indicate, and the material to be operated upon located between the electrodes and in contact therewith. The material might be ore and carbon mixed, as shown in the diagram, or it might be the material alone, according to its nature. It is an established rule, for the purpose of determining whether there is a substantial identity or equivalency of two inventions, that we may apply this test, and inquire whether the construction which is alleged to infringe may, by the skill of one conversant with the art, be built upon the specifications of the patent said to be infringed.

Something is sought to be inferred from the subsequent conduct of the parties to aid in the construction of the contract. Where the instrument is of dubious import, proof of this kind is receivable in order to show in what sense the parties understood it. But such proof is liable to open up a controversy in regard to what the conduct of the parties really was, and can only be resorted to when the contract, read in the light of surrounding facts, leaves the construction in doubt. But, if such doubt existed in the present case, the action of the parties here referred to gives nearly equal ground for opposite conclusions. It is urged that the Cowles Electric Smelting & Aluminum Company.

did not prosecute the Bradley application, but allowed it to lie dormant in the patent office for many years.    On the other hand, Bradley himself did not move again upon it for nearly two years after the contract was made.    And we think it may fairly be said that the Cowles Company, finding their own and that of Bradley and Crocker sufficient for their purposes,  had no special requirement for the Bradley application, which at that time stood rejected, though such rejection was not final.    While, on the other hand, if Bradley supposed his own application still available for his own advantage, it is somewhat singular, knowing that it related to a then rapidly-developing industry, he should have left it so long neglected.    Bradley claims that his process is capable of being carried on continuously by simply adding unfused ore, but there is the same capacity in this respect in the Cowles process.    In either of them, by tapping the tank or other containing vessel at or near the bottom and making provision for a constant supply of material by any common method, the process could be continued indefinitely.    Such supplements would not alter the process itself, and would indeed be only such as ordinary skill would provide if it should be found desirable to employ them.    Upon the whole case, we are satisfied that the inventions covered by the Bradley application were intended to be included by the terms of the contract; that Bradley's unauthorized proceedings thereon, whereby he procured his patents, must be held to inure to the benefit of the Cowles Electric Smelting & Aluminum Company.    The result is that the decree below should be reversed, the original bill dismissed, and the relief prayed by the cross bill should be granted.